IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PHILIP PATRICK SHEAHAN,

                    Plaintiff,

     v.

DALIA SULIENE, NANCY WHITE,
PAUL KETARKUS and FERN SPRINGS,

                    Defendants.

OPINION AND ORDER

12-cv-433-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     In this civil action, plaintiff Philip Patrick Sheahan, a prisoner incarcerated at the Wisconsin Secure Program Facility, is proceeding pro se on claims of retaliation, medical negligence and Eighth Amendment deliberate indifference, stemming from defendants' alleged failure to treat his hand injury properly. Two motions are before the court. The first is plaintiff's one-sentence motion, dkt. #49, asking the court to reconsider its August 9, 2013 decision denying his motion for assistance in recruiting counsel to assist him. Because a party's failure to present an argument in support of his motion constitutes a waiver of that argument, Weinstein v. Schwartz, 422 F.3d 476, 477 n.1 (7th Cir. 2005), I will deny his motion for reconsideration.

     The second motion is defendants' motion for summary judgment, dkt. #34, which has now been fully briefed, along with a motion to stay the proceedings. Dkt. #57. After considering the parties' summary judgment materials, I conclude that plaintiff has failed to

1

show that defendant violated his rights in any way. Accordingly, I will grant defendants' motion for summary judgment and direct the clerk of court to close the case. I will deny the motion to stay proceedings as moot.

From the parties' proposed findings of fact and supporting evidence, I find that the following facts are undisputed and material.

UNDISPUTED FACTS

A. Plaintiff's Accident and Treatment

At all relevant times, plaintiff Philip Sheahan was an inmate confined at the Columbia Correctional Institution. From January 3, 2006 to April 5, 2013, defendant Dalia Suliene was employed as a physician in the Health Services Unit at the Columbia Correctional Institution. Defendant Fern Springs is a physician at the Chippewa Valley Correctional Treatment Facility. On August 1, 2011, she was working as a physician at the Columbia Correctional Institution to provide coverage for defendant Suliene, who was not working on that day. At all relevant times, Paul Ketarkus was employed as a nurse and Nancy White was the health services manager at the Columbia Correctional Institution.

On July 25, 2011, plaintiff suffered two injuries to his left hand while working at Badger State Industries. He was helping a co-worker operate an industrial cutter, when the machine activated and caught his left hand. After the injury, an officer walked plaintiff to the Health Services Unit for treatment.

Defendant White was in the Health Services Unit that day. She attempted to comfort plaintiff verbally as he awaited transportation to Divine Savior Hospital. White did

2

not discuss plaintiff's work assignment with him at that point. She never personally examined or met with plaintiff after July 25, 2011.

Plaintiff was taken by ambulance to Divine Savior Hospital. Once he arrived at the hospital, Dr. Steven Novacheck treated the hand lacerations, suturing both. He prescribed Vicodin for pain and provided "follow-up instructions" for a wound recheck the following day and suture removal in ten days.

After returning from the hospital later that day, plaintiff stopped at the Health Services Unit and the nurse on duty (who is not a defendant in this case) was given the doctor's orders. Plaintiff asked about being placed on a work restriction but the nurse told him to bring that up at his doctor's appointment the next day.

The following day, work started for plaintiff at 7 a.m., prior to his scheduled followup appointment with defendant Suliene. Plaintiff states that he went to work that morning because he "had to." However, plaintiff had the option of going on "lay-in" status. The Division of Adult Institutions treats lay-in status as "a non-paid status indicating the inmate had been excused from his or her work or program assignment until the next work or program day at the discretion of the assignment supervisor." Defendants state that, in practice, these requests are routinely granted as a matter of course. Pursuant to the policy, on the third day of lay-in status, the assignment supervisor notifies the Health Services Unit that the inmate needs to be seen for a face-to-face assessment of the inmate that day. These appointments are free to the inmates, according to the regulations. (Plaintiff states that there is a $7.50 co-pay but does not provide any supporting evidence.) At the face-to-face assessment, Health Services Unit staff determines whether "sick cell" status should apply and

3

notifies the assignment supervisor. If an inmate is put on sick cell status, he gets paid at the involuntary unassigned rate as opposed to being in a non-paid status. However, work-related injuries do not affect pay status, which I take to mean that inmates who are placed on sick-cell status after sustaining work-related injuries continue to get paid at the full rate. It is unclear whether they receive pay for the time on "lay in" status before being placed on sick-cell status.

Plaintiff is aware of the availability of lay-in status, as he had used it in the past. At his deposition, he testified as follows:

> Q. So did you consider taking a sick day?
>
> A. No.
>
> Q. Why not?
>
> A. Because I – I'm not going to lose my money. I have nobody out there taking care of me.
>
> Q. So you could have taken a sick day, but you didn't want to lose money. Is that your statement?
>
> A. Yes.
>
> \* \* \*
>
> Q. And at that point, if you wanted to go back to your cell and lay down, you could have done the sick cell process; right?
>
> A. Probably, yeah.
>
> Q. To do that, you could have – who would you have told at that point that you were going on sick cell? Your supervisor at work; is that right?
>
> A. The supervisor or the sergeant that's on the desk.
>
> Q. That, you could have done before you even got to work?

4

> A. I could have done it before I got to work, or else I could have done it at work.
>
> * * *
>
> Q. And why, again, did you want a work restriction and not just to take sick cell time?
>
> A. Because I get paid. I'll get paid for my job.

Plt's Dep., dkt. #33, at 37, 40, 44.

On July 26, 2011, plaintiff worked "taping" license plates, which caused him pain. After being at work for a couple of hours on July 26, 2011, plaintiff saw defendant Dr.Suliene for his scheduled followup. Prior to the appointment, Suliene reviewed the emergency room documentation. She observed Nurse Melissa Thorne change plaintiff's dressing, apply Bacitracin and telfa and re-bandage plaintiff. Plaintiff had swelling but the sutures on both lacerations were intact. Suliene clarified the Vicodin prescription as one tab, four times each day for five days. She also ordered plaintiff to apply ice three times a day for one week and to use an extra pillow to elevate his hand for two weeks. She prescribed Cephelexin, an antibiotic used to prevent postoperative wound infection.

Nurses or doctors can make the decision to order an inmate off work using the "Medical Restrictions/Special Needs" form. Nurse Thorne signed the July 26, 2011 "Medical Restrictions/ Special Needs" form and did not include a "no work" restriction. Dr. Suliene never saw this form.

Plaintiff alleges that at the July 26 appointment, he asked Suliene for a work restriction. He claims that she said one "would not be implemented at this time," and that was the end of the conversation. Defendants dispute this version of events. They state that

Suliene does not recall plaintiff specifically asking her about a work restriction and her notes do not reflect that a conversation occurred regarding a work restriction. Suliene states that she assumed that plaintiff was already off work because of the injury and that when he came back for his followup appointment in ten days they would discuss when he would be going back to work. Suliene knew that plaintiff had the option of going on lay-in status. She believes that if he had asked her for a work restriction, she would have granted it.

Defendant White remembers receiving one call between July 26 and July 31 from plaintiff's work site. She does not remember the specific date. The person who called asked whether plaintiff had any work restriction in place. This was the first time White learned that no work restriction had been ordered for plaintiff. After receiving the phone call, White told one of her staff that plaintiff should be checked to see how he was healing and possibly put on a work restriction if warranted. White does not know what happened after this.

On Monday August 1, 2011, plaintiff asked his supervisor to be seen in the Health Services Unit because he was experiencing throbbing pain in his hand. He was seen later that day by defendants Nurse Ketarkus and Dr. Springs, who was filling in for defendant Suliene. Plaintiff complained of pain, throbbing, trouble sleeping and having to go to work. Springs examined the wound and noticed that the smaller laceration was healing well. However, the edges of the longer laceration did not appear to be healing together, which Springs believed meant that the sutures were not serving their purpose. Also, drainage from the opening of the longer laceration indicated a possible infection. From the appearance of the wound it appeared possible that an inflammatory reaction to the sutures themselves was

present or that foreign particles had been introduced to the wound at the time of the injury.

Springs suspected an infection and ordered cultures. She also ordered plaintiff to discontinue taking Cephelexin, and to start Minocycline. Minocycline and Cephelexin are both antibiotics that are used to treat skin infections. Because plaintiff had complained that work was hurting his hand and because the second laceration was not healing properly, Springs ordered plaintiff off work. Also, she ordered him not to participate in recreation except for walking. The restrictions were put in place for August 1, 2011 through August 7, 2011.

Plaintiff asked Springs whether "there was anything that she could do to help [him] with the pain." Plaintiff states that Springs responded, "I'm not here to argue with you about narcotics" in a "snappy" fashion. Plaintiff states that he responded, "I never said anything about narcotics." Springs then left. However, she did prescribe a narcotic pain reliever (Vicodin) for plaintiff, and defendant Ketarkus gave plaintiff a Vicodin pill at the appointment.

Springs ordered the sutures removed after consulting with a surgeon. The two agreed agreed that this would be the best course, given the lack of healing and possibility of infection in the longer laceration. Defendant Springs ordered defendant Nurse Ketarkus to remove the sutures.

Defendant Nurse Ketarkus was not present for the discussion plaintiff had with defendant Springs regarding narcotics on August 1, 2011. After Springs saw plaintiff on August 1, 2011, she told Ketarkus to give plaintiff a Vicodin pill. Ketarkus had no reason

to believe that Springs's order to remove plaintiff's sutures was motivated by malice.

Plaintiff was seen by Dr. Hirschfield for a followup on August 4, 2011. Plaintiff still complained of "throbbing" and was concerned about infection. The doctor noted that plaintiff was taking Minocycline and had completed a course of Cephelexin and he saw no evidence of current infection. He told plaintiff to decrease the duration of Minocycline to five days, to finish on August 6.

Also on August 4, defendant White received correspondence that plaintiff had written as part of the institutional grievance process. In the letter, plaintiff questioned why he had not been given a work restriction.

Plaintiff was left with a 1-inch scar and a 2.5-inch scar, respectively. He believes that his scar would not have been as disfiguring had the sutures remained in until the tenth day. After August 4, 2011, the only communication the Health Services Unit received regarding plaintiff's hand was a question from plaintiff asking whether the feeling on the inner side of his thumb would ever return. He received a response to the effect that nerves heal very slowly and may take years.

After plaintiff's week-long work restriction, he returned to his job and remained employed by Badger State Industries until he was transferred to another institution in 2012.

B. Expert Testimony

1. Defendant Springs

From her knowledge and expertise as a physician, defendant Springs believes that the

typical amount of time for sutures to remain in place for an injury such as plaintiff's is seven to ten days. August 1, 2011 was the at least the seventh day following plaintiff's injury. Springs believes that because the shorter laceration was healing well, it was appropriate and within the standard of care to remove the sutures from the shorter laceration on August 1, 2011. Also, Springs believes that it was appropriate and within the standard of care to remove the sutures from the longer laceration on August 1, 2011 in light of signs of infection and lack of healing. Because the edges of the longer laceration had not sealed together, it was clear to her that the extra few days would not have solidified the healing. If there are signs of infection, wound "dehiscence" (which I understand to be splitting along the wound) or excessive drainage, it is recommended that sutures be removed and the wound be allowed to heal by forming granulation tissue from the bottom of the wound outward. If sutures stay in too long, and an infection is present, the infection can get trapped inside the lesion and can go deeper. It can even get into the bone, causing potential need for prolonged courses of daily intravenous antibiotics, surgical debridement of the wound or even amputation. Removing the sutures can help prevent infection from developing or keep it from progressing.

Plaintiff's culture eventually came back negative. However, it is possible to have false negative results, meaning that an infection may have been present even though it did not show up in the lab results. This is especially possible in plaintiff's case because he was taking an antibiotic, Cephelexin, and using a topical antibiotic, which can account for a false negative culture result.

It is accepted medical practice for doctors to base treatment decisions on their present-day observation of how wounds are healing, rather than simply following the recommendation of the doctor who put in the sutures. The current treating doctor is in the best place to determine when the sutures should come out because she is aware of the healing status of the wound. This doctor can react to signs of infection, to signs that the sutures are not working or to signs that the wound has healed faster than anticipated.

The healing period for nerves is not affected by the length of time sutures are left in. Rather, it is affected by the type and extent of damage that was done. From her review of photographs of plaintiff's hand, Springs believes that the wounds healed extremely well. The resulting scars look like normal scars that would have formed in anyone with a similar injury.

2. Defendant Suliene

In light of her knowledge and expertise and plaintiff's particular injury, Suliene believes that plaintiff could have done certain types of low-impact work without compromising the healing process and that the work plaintiff was doing when he returned to work would not have interfered with the healing process.

Further, Suliene believes that defendants Springs and Ketarkus provided plaintiff appropriate medical care. Ketarkus removed plaintiff's sutures on August 1, 2011, which is within the seven to twelve days in which sutures for injuries are typically removed, depending on the nature of the injury. If a wound has sufficiently healed by this time, it is appropriate to remove the sutures. According to the medical records, the short laceration

had healed well.

Removing sutures can be appropriate when a wound is showing signs of infection and is not healing well. Leaving sutures in a wound that is infected can lead to dangerous complications, whereas removing the sutures can help the wound heal better and prevent or lessen further infection. Because it is not always possible to tell when a wound is infected, it is entirely appropriate to remove the sutures as a precautionary measure. From defendant Suliene's review of the photographs of plaintiff's hand, it is her belief that the scars left by plaintiff's lacerations are not out of the ordinary.

OPINION

Plaintiff was granted leave to proceed on the following claims:

(1) Eighth Amendment deliberate indifference claims against defendants Suliene and White for failing to give plaintiff a work restriction despite knowing the extent of his injuries;

(2) Eighth Amendment deliberate indifference claims against defendant Springs for ordering the premature removal of the sutures from plaintiff's hand and against defendant Ketarkus for performing the removal;

(3) Wisconsin common law medical negligence claims against defendants Suliene and Ketarkus; and

(4) First Amendment retaliation claims against defendants Springs and Ketarkus for removing plaintiff's sutures early.

Defendants seek summary judgment on each of these claims.

A. Eighth Amendment Medical Care

Under the Eighth Amendment, prison officials have a duty to provide medical care to those being punished by incarceration. Estelle v. Gamble, 429 U.S. 97, 103 (1976). To state an Eighth Amendment medical care claim, a prisoner must allege facts from which it can be inferred that he had a "serious medical need" and that prison officials were "deliberately indifferent" to this need. Id. at 104.

A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, Gutierrez v. Peters, 111 F.3d 1364, 1371-73 (7th Cir. 1997), "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), or otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825, 847 (1994).

"Deliberate indifference" means that defendant was aware that the prisoner needed medical treatment but disregarded the risk by failing to take reasonable measures. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). However, inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996); Snipes, 95 F.3d at 590-91. Thus, disagreement with a doctor's medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth

12

Amendment claim. Gutierrez, 111 F.3d at 1374; Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006) ("[E]ven admitted medical malpractice does not give rise to a constitutional violation.").

Plaintiff was allowed to proceed on Eighth Amendment deliberate indifference claims against defendants Suliene and White for failing to give him a work restriction despite knowing the extent of his injuries. These claims are not about direct "medical treatment" per se but rather claims that defendants caused plaintiff pain by forcing him to return to work without restriction. Even assuming plaintiff's version of the events is correct and that Suliene denied him a work restriction (Suliene says that the topic never came up), it is undisputed that Suliene was unaware that plaintiff faced any harm. The undisputed facts show that Suliene's denial of a work restriction did not force plaintiff to work with an injured hand. Rather, plaintiff could have taken "lay-in" status but chose not to do so. This is supported by plaintiff's deposition testimony:

Plaintiff suggests that his supervisors were laughing about the injury and argues that a supervisor, Alan Pulver, told plaintiff that he would have to work or face termination or a conduct report. However, statements and actions by plaintiff's supervisors is irrelevant because they are not defendants in this action and plaintiff has not shown that defendant Suliene knew about these statements. In light of the regulations in place for workplace injuries, Suliene had no reason to think that plaintiff would have had to work if he did not want to, regardless whether she wrote him a work restriction.

Plaintiff is pursuing a similar Eighth Amendment claim against defendant White, the

13

health services manager, for failing to give him a work restriction, but it appears from the undisputed facts that White asked other medical staff to look into the issue, which refutes a claim of deliberate indifference. Even if White had decided against a work restriction, plaintiff's claim against her would fail because the lack of a work restriction did not place him in danger; as far as she knew, he retained the ability to take lay-in status.

Also, plaintiff brings Eighth Amendment claims against defendant Springs for ordering his stitches removed prematurely and against Nurse Ketarkus for removing the stitches. However, the entire premise that his stitches were removed "prematurely" depends on his belief that seven or so days is too early to remove the stitches. He alleges that Dr. Novacheck had suggested ten days before removal and that they were removed in retaliation for his arguing about the prescribing of narcotic pain medication. I cannot draw any inferences in favor of plaintiff from the timing itself; even to the extent that one could characterize Novacheck and Springs as disagreeing about the proper time to remove stitches, such a disagreement does not violate the Eighth Amendment. Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996) ("Mere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference.").

In any case, it is extremely dubious to suggest that Novacheck and Springs truly "disagreed" in the first place. As defendants' expert testimony shows (and common sense supports), a treating physician has to be able to make judgments on the basis of the patient's condition at the time of the medical decision. The decision to remove the stitches from the

14

first wound was based on plaintiff's rate of recovery; the stitches were removed from the second wound because of signs of infection and lack of healing; and the timing was within the accepted timeline for such a decision.

Plaintiff does not rebut the expert testimony with any of his own. To the extent that plaintiff had the burden to show that the treatment "decision [was] such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment," Estate of Cole, 94 F.3d at 261, he has failed to meet it. Plaintiff believes it is contradictory for Springs to state that it is common practice to remove sutures when a wound is not healing well and also common practice to remove sutures when a wound is healing well. However, defendants' experts explained in easily understandable terms why it was appropriate to remove both sets of stitches after approximately seven days.

The only evidence plaintiff provides to support his belief that the sutures were purposely removed too early is the "argument" with Springs, leading to her retaliating against him, but as explained further below, he provides little reason for this claim. Although plaintiff states that Springs was "snappy" with him, Springs gave plaintiff the pain medication he sought and put him on a one-week work restriction so that he could rest his arm. In light of these facts and the undisputed expert medical testimony indicating that the decision to remove the sutures was medically appropriate, plaintiff is left with nothing more than mere speculation that the removal was ordered for retaliatory reasons. He cannot show that he was harmed by the removal of the sutures. In his opinion, the scars are more

"disfiguring" than they would have been and he may not regain the full function of his hand, but as a layman, he is in no position to know whether these results are the consequence of poor treatment. To the contrary, defendants' expert testimony indicates that the timing of the removal of the stitches had nothing to do with these results.

Finally, plaintiff argues generally that defendants have not provided "medical exhibits or documents that support their opinion" on these issues. He is incorrect; Suliene's and Springs's expert testimony is exactly the type of medical evidence that defeats plaintiff's claims. Accordingly, I will grant defendants' motion for summary judgment on plaintiff's deliberate indifference claims against Springs and Ketarkus for the removal of plaintiff's stitches.

### B. State Law Medical Negligence

Wisconsin law defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." Sawyer v. Midelfort, 227 Wis. 2d 124, 149, 595 N.W.2d 423, 435 (1999); Schuster v. Altenberg, 144 Wis. 2d 223, 229, 424 N.W.2d 159, 161-62 (1988). Plaintiff contends that defendant Suliene was negligent by failing to order the work restriction and Ketarkus was negligent by removing the sutures too early.

Like all claims for negligence, a claim for medical malpractice includes the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff.

Paul v. Skemp, 2001 WI 42 ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860 (2001). Thus, to establish a prima facie medical negligence claim, plaintiff must show that defendants failed to use the required degree of skill exercised by an average respective medical professional, that plaintiff was harmed and that there is a causal connection between defendants' failure and plaintiff's harm. Wis J-I Civil 1023. Unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care. Christianson v. Downs, 90 Wis. 2d 332, 338, 279 N.W.2d 918, 921 (1979).

With regard to both medical negligence claims, plaintiff has failed to submit expert testimony establishing the standard of care, which is enough to doom his claims. Moreover, the testimony presented by the parties show that defendants were not negligent. With respect to the claim against Suliene, it was plaintiff who made the decision to continue working even though he could have taken lay-in status. Defendants' expert testimony makes clear that Ketarkus's removal of the stitches was medically appropriate. Because plaintiff fails to adduce any evidence indicating otherwise, I must grant defendants' motion for summary judgment on these claims.

## C. First Amendment Retaliation

Finally, plaintiff brings First Amendment retaliation claims against defendants Springs and Ketarkus for removing his sutures too early. To succeed on these claims, plaintiff must show (1) the constitutionally protected activity in which he was engaged; (2) one or more

17

retaliatory actions taken by defendants that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) sufficient facts to make it plausible to infer that the plaintiff's protected activity was one of the reasons defendants took the actions they did against him. Bridges v. Gilbert, 557 F.3d 541, 556 (7th Cir. 2009).

Both claims fail. First, there is no reason to think that a person of ordinary firmness in plaintiff's position would be deterred from speaking to his doctor about medical treatments. Second, there is no reason to think that defendants acted with a retaliatory purpose. Plaintiff's sole basis for believing that there was a retaliatory motive was that he believes the stitches were removed early and that Springs was "snappy" with him. However, the expert medical testimony indicates that the stitches were removed within an medically appropriate time and for appropriate reasons. Even plaintiff's belief that Springs expressed animosity toward him is belied by the fact that Springs gave him the narcotic medication he wanted and put him on work release. The case against Ketarkus is even thinner; it is undisputed that Ketarkus was not aware of the "argument" between plaintiff and Springs and was acting on Springs's orders.

Plaintiff is clearly upset that the decision to remove the stitches came immediately after the "argument" with defendant Springs. Plaintiff may rely on "[c]ircumstantial proof, such as the timing of events . . . to establish the defendant's retaliatory motive," Massey v. Johnson, 457 F.3d 711, 716-17 (7th Cir. 2006), but suspicious timing is almost never sufficient by itself to establish a retaliatory motive. Stone v. City of Indianapolis Public Utilities Division, 281 F.3d 640, 644 (7th Cir. 2002). Given the facts and expert testimony

adduced by defendants explaining the medical basis for the removal of the sutures, plaintiff is left with nothing but speculation to support his theory of retaliation, which is not enough to defeat defendants' motion for summary judgment. Rockwell Automation, Inc. v. National Union Fire Insurance Co. of Pittsburgh, PA, 544 F.3d 752, 757 (7th Cir. 2008) ("'mere speculation or conjecture will not defeat a summary judgment motion'") (quoting McCoy v. Harrison, 341 F.3d 600, 604 (7th Cir. 2003)).

ORDER

IT IS ORDERED that

1. Plaintiff Philip Sheahan's motion for reconsideration of the August 9, 2013 decision denying his motion for the court's assistance in recruiting counsel to assist him, dkt. #49, is DENIED.

2. The motion for summary judgment filed by defendants Nancy White, Dalia Suliene, Fern Springs and Paul Ketarkus, dkt. #34, is GRANTED.

3. Defendants' motion to stay the proceedings, dkt. #57, is DENIED as moot.

4. The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 25th day of March, 2014.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge